1

2

3

4

5

6                                    UNITED STATES DISTRICT COURT

7                                          DISTRICT OF NEVADA

8                                                   * * *

9    MATT MOONIN; DONN YARNALL; and          )
     ERIK LEE,                                )
10                                            )          3:12-CV-00353-LRH-VCF
                     Plaintiffs,              )
11                                            )
     v.                                       )          ORDER
12                                            )
     STATE OF NEVADA, ex rel. its             )
13   DEPARTMENT OF PUBLIC SAFETY              )
     HIGHWAY PATROL; LAS VEGAS                )
14   METROPOLITAN POLICE DEPARTMENT;          )
     CITY OF LAS VEGAS; CLARK COUNTY;         )
15   DOUG GILLESPIE, Sheriff; DAVE LEWIS;     )
     JOHN STEWART; KEVIN TICE; THOM           )
16   JACKSON; JIM PETERSON; WAYNE             )
     PROSSER; CHARLES HAYCOX; BRIAN           )
17   SANCHEZ; HUGH SHOOK; TODD                )
     ELLISON; ERVIN RAAB; BEN LEONARD;        )
18   LUIS ZAPATA; DONALD DICE; CHRIS          )
     PERRY, individually and in his official  )
19   capacity; PAT GALLAGHER; GREG ZEIL;      )
     DALE JAEGER; MEL ENGLISH; TOM            )
20   HIGGINS; MARK RISPOLI; MAKOR K-9;        )
     DOES 1-9, inclusive, AND CORPORATIONS    )
21   10-14,                                   )
                                              )
22                   Defendants.              )
     _____)
23

24          This is a suit concerning the Nevada Highway Patrol's ("NHP") K9 unit. Before the court

25   are various defendants' motions to dismiss. Defendants Makor K-9 and Rispoli have together filed

26   a Motion to Dismiss (#31), as have defendants Las Vegas Metropolitan Police Department

1   ("LVMPD") and Zeil (#32) and defendants Gillespie, English, and Jaeger (#33). The remaining

2   Nevada state defendants (referred to as "NHP" for reasons apparent below) have also filed a

3   Motion to Dismiss (#38). Plaintiffs Moonin, Yarnall, and Lee have responded to each motion

4   (##75, 76, 77, and 72, respectively) and the defendants have all replied (##82, 84, 83, and 88,

5   respectively).

6   **I.      Facts and Procedural History**[1]

7          This dispute concerns the creation and implementation of a canine drug detection unit ("K9

8   program") within the NHP. Plaintiffs are officers who were formerly involved in the K9 program.

9          Plaintiffs allege as follows:

10         That NHP higher-ups were against the K9 program from the start. When the K9 program

11  finally got off the ground–thanks to the insistence of Nevada's Governor and the Director of the

12  Department of Public Safety–these higher-ups worked to undermine and marginalize it. After

13  Plaintiffs objected to this intentional mismanagement, NHP officials retaliated against them. As a

14  consequence of NHP's efforts, Plaintiffs argue, NHP's K9 program engages in routine Fourth

15  Amendment violations.

16         Plaintiffs Lee and Moonin are former NHP K9 troopers, and plaintiff Yarnall is the former

17  architect of the NHP's K9 program. Defendants are, for the most part, various NHP officials led by

18  defendant Perry. Plaintiffs allege that the NHP officials expressed their antipathy toward the K9

19  program in a variety of ways: by shuffling the K9 program from one umbrella department to

20  another in an attempt to destabilize it; by requiring time-consuming and redundant training of the

21  K9 troopers; by springing last-minute busywork on Yarnall; by tampering with Yarnall's written

22  reports to make it seem as if Yarnall were incompetent; by deleting training records from

23  computers; by delaying contractual payments to Yarnall and reimbursements to Lee; by accusing

24

25          ───────────────────

26          [1] In reviewing a motion to dismiss, the court accepts facts alleged in the complaint as true.
    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1   Yarnall of a history of excessive force complaints; by initiating baseless internal investigations; by

2   refusing to investigate Plaintiffs' complaints; by insulting Moonin's dog.

3        Despite all this, the K9 program initially flourished, yielding impressive drug and currency

4   seizures. The K9 program's success was due in large part to the high training standards Yarnall had

5   implemented–standards he had erected by working longer hours and more days than his contract

6   required.

7        And so the NHP officials sought to replace Yarnall's high standards with lower ones. As

8   part of this effort, NHP officials allegedly filed false complaints against Yarnall and Lee; took files

9   from the K9 program's offices; denied the provision of necessities like dog food; and issued orders

10  barring dogs from the K9 program's offices. They also cried poor when K9 program officers

11  requested resources, despite the fact that the K9 program was funded out of seized currency and

12  despite the fact that the K9 program had seized more than enough money to keep the program

13  going.

14       In 2009, Lee and Moonin began observing the toll these efforts were having. Attempts to

15  decentralize the program and reduce training standards had led to increased Fourth Amendment

16  violations by K9 troopers. Lee and Moonin alerted NHP officials to this, but their warnings went

17  unheeded. When, in late 2009, the NHP officials replaced the K9 program's head with someone

18  more pliable, the K9 troopers submitted a letter to the Director of the Department of Public Safety

19  outlining their grievances.

20       This letter further roiled the waters. NHP officials eliminated the K9 troopers' ability to

21  earn overtime; they malingered with respect to renewing Yarnall's contract; they gave Moonin

22  unnecessary tasks.

23       At the end of 2010, the K9 program's last high-ranking defender, the Director of the

24  Department of Public Safety, retired. Perry succeeded him as Director and intensified his campaign

25  to ghettoize the K9 program. For example, while Yarnall's contract extension had been assured

26  under the prior Director, Perry decided not to renew Yarnall's contract. Yarnall's employment with

1  NHP ended in March 2011.

2        In April 2011, Perry split the K9 program into two squads including both NHP officers and

3  LVMPD officers. During the following summer, Moonin observed a marked increase in

4  unconstitutional searches. In particular, Moonin was alarmed at the routine practice of poking holes

5  in packages at a FedEx sort facility so that K9 program dogs could more easily smell the packages'

6  contents. Moonin reported this practice, but his reports did not result in any changes.

7        While the dogs' nose for drugs failed, the media's nose for news did not. At least five

8  televised interviews with members of NHP and LVMPD occurred over the course of late 2011 and

9  early 2012, centering on the unconstitutional searches and the implosion of the K9 program.

10  Rumors spread that Moonin was the media's source.

11        Moonin denied these rumors, but they caused him significant grief anyway. NHP and

12  LVMPD employees ramped up their harassment, and Moonin eventually filed a complaint with

13  NHP's Office of Professional Responsibility. Moonin also requested a transfer out of his squad, but

14  his request was ignored.

15        In September 2011, the NHP's K9 troopers–including Moonin and Lee–resigned en masse

16  from the K9 program. They cited their objections to the training methods as well as the resulting

17  civil rights violations. NHP placed Moonin and Lee in lower-status positions within the NHP,

18  where they remain.

19  **II.**    **Legal Standard**

20        To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the

21  Federal Rule of Civil Procedure 8(a)(2) notice pleading standard. *See Mendiondo v. Centinela*

22  *Hospital Medical Center*, 521 F.3d 1097, 1103 (9th Cir. 2008). A complaint must contain "a short

23  and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

24  8(a)(2). The Rule 8(a)(2) pleading standard does not require detailed factual allegations; however, a

25  pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

26  cause of action" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

4

1    *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

2           Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter,

3    accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks

4    omitted). A claim has facial plausibility when the pleaded factual content allows the court to draw

5    the reasonable inference, based on the court's judicial experience and common sense, that the

6    defendant is liable for the misconduct alleged. *See id.* at 678-79. "The plausibility standard is not

7    akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has

8    acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's

9    liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at

10   678 (internal quotation marks and citation omitted).

11          In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as

12   true. *Id.* (citation omitted). However, "bare assertions . . . amount[ing] to nothing more than a

13   formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth."

14   *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at

15   680) (alteration in original) (internal quotation marks omitted). The court discounts these

16   allegations because they do "nothing more than state a legal conclusion – even if that conclusion is

17   cast in the form of a factual allegation." *Id.* "In sum, for a complaint to survive a motion to dismiss,

18   the non-conclusory 'factual content,' and reasonable inferences from that content, must be

19   plausibly suggestive of a claim entitling the plaintiff to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

20   **III.    Discussion**

21          Plaintiffs have lodged thirteen claims against Defendants. These claims fall into two broad

22   categories: claims for Plaintiffs' personal harms (First Amendment violations, First Amendment

23   retaliation, state civil conspiracy, conspiracy under 18 U.S.C. § 1985(1), defamation, trespass, state

24   fraud, and unjust enrichment) and claims resulting from the mismanagement of the K9 program

25   (Fourth Amendment violations, failure to train under 42 U.S.C. § 1983, and civil RICO under 18

26

1  U.S.C. § 1962). Since Plaintiffs do not have standing to assert the latter claims, however, they

2  cannot recover for the lack of success of the K9 program.

3  **A.  11th Amendment Immunity**

4  First, the state of Nevada has asserted its Eleventh Amendment immunity. In most cases, a

5  state may not be sued in federal court unless it consents to be sued. U.S. Const. Amend. XI. This

6  immunity applies to state agencies as well as state officials sued in their official capacity.

7  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). Furthermore, neither a

8  state nor its officials acting in their official capacities are "persons" under 42 U.S.C. § 1983, and

9  therefore section 1983 does not provide a cause of action against these entities. *Will v. Michigan*

10 *State Police*, 491 U.S. 58, 71 (1989). This last proposition is subject to one exception: where the

11 state official is sued for prospective injunctive relief, the action is properly brought under section

12 1983. *Wolfe v. Strankman*, 392 F.3d 358, 365 (9th Cir. 2004).

13 Here, the state of Nevada and its agency the NHP are immune from suit. Nev. Rev. Stat.

14 ("NRS") § 41.031 (providing that Nevada has not waived its Eleventh Amendment immunity).

15 Furthermore, except for Perry, the complaint does not specify the capacity in which the defendants

16 are sued. Therefore, the court presumes the defendants are sued in their personal capacities. *See*

17 *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999). This presumption comports with the

18 remedies sought (damages) and the defenses raised (qualified immunity). *See Biggs v. Meadows*, 66

19 F.3d 56, 59-60 (4th Cir. 1995) (looking to the "substance of the plaintiff's claim, the relief sought,

20 and the course of proceedings to determine the nature of a section 1983 suit when plaintiff fails to

21 allege capacity"). Finally, Perry is subject to suit in his official capacity because the complaint

22 seeks injunctive relief in the form of reinstatement. *See Wolfe*, 392 F.3d at 365.

23 ///

24 ///

25 ///

26 ///

6

**B. Claims Stemming from Mismanagement of the K9 Program**

Plaintiffs' claims for violations of the Fourth Amendment, failure to train under section 1983, and civil RICO[2] under 18 U.S.C. § 1982 all stem from the alleged mismanagement of the K9 program. However, Plaintiffs do not have standing to assert these claims, and these claims consequently fail.

All three of these claims revolve around the Fourth Amendment violations that Moonin and Lee observed. But in order to challenge Fourth Amendment violations, the challenger must show that the government has infringed his reasonable expectation of privacy. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009). This means that the Fourth Amendment violation must have been "a violation as to him, personally." *Id.* (quoting *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)).

Here, Plaintiffs do not have standing to vindicate the Fourth Amendment rights of the poked-package owners or others unconstitutionally searched. When, in the parties' papers, various defendants have pointed this out, Plaintiffs have responded that they "did not forfeit all constitutional rights by becoming member[s] of a police force." (Plaintiffs' Response #72 at p. 31:12-13.) Whatever this response means, it falls short of asserting an actionable interest in the subject of the searches and therefore short of alleging a redressable Fourth Amendment violation. And without this, neither the Fourth Amendment claim, *see SDI*, 568 F.3d at 695, nor the failure-to-train claim, *see Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 400 (1997) (holding that the municipal policy must be a "moving force" behind the violation of *plaintiff's* federally protected right), nor the RICO claim, *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) ("A civil RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."), will succeed.

---

[2] The Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–1968.

1    **C.  First Amendment Claims**

2        Plaintiffs have asserted two different breeds of First Amendment claims: prior restraint

3    claims and a retaliation claim.

4        **1.      Prior Restraint Claims**

5        Courts evaluate prior restraints of government employee speech through the lens of

6    *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968).

7    *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466 (1995). *See also Gibson v.*

8    *Office of Atty. Gen., State of California*, 561 F.3d 920, 926 (9th Cir. 2009). The *Pickering* test

9    requires the court to balance "the interests . . . of a citizen, in commenting on matters of public

10   concern and the interest of the State, as an employer, in promoting the efficiency of the public

11   services it performs through its employees." *Pickering*, 391 U.S. at 568. Thus, *Pickering* balancing

12   only applies to speech made "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547

13   U.S. 410, 418 (2006).

14       *Garcetti* addressed the distinction between speech made "as a citizen" and speech made "as

15   an employee." Speech made as an employee is speech that "owes its existence to a public

16   employee's professional responsibilities." *Id*. at 421. Restricting such speech "simply reflects the

17   exercise of employer control over what the employer itself has commissioned or created." *Id*. at

18   421-22. Thus, if the prior restraint exceeds the scope of regulating speech-as-employee and intrudes

19   on speech-as-citizen, the prior restraint may be subject to *Pickering* balancing. *See Milwaukee*

20   *Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009) ("The real dispute in this case is

21   the extent to which the [prior restraint] encompasses speech by an employee as a citizen.").

22       *Pickering* balancing should accord government employers "wide discretion and control over

23   the management of their personal and internal affairs." *Gilbrook v. City of Westminster*, 177 F.3d

24   839, 867 (9th Cir. 1999) (citation and quotation marks omitted). On the other hand, "the more

25   tightly the First Amendment embraces the speech, the stronger the showing of workplace disruption

26   must be." *Id*. (citation and quotation marks omitted). Factors considered in the balancing have

included whether the speech "(1) impaired discipline or control by superiors; (2) disrupted co-worker relations; (3) eroded a close working relationship premised on personal loyalty and confidentiality; (4) interfered with the speaker's performance of his or her duties; or (5) obstructed routine office operations," as well as "(6) whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague; (7) whether the speaker served in a high-level, policy-making capacity; and (8) whether the statement was false or made with reckless disregard of the truth." *Id*. at 867-68 (citations omitted).

Here, Perry's deputy Tice sent an NHP-wide email in February 2011 stating in relevant part:

> Effective immediately, except for allied LE [law enforcement] agencies and HIDTA [high intensity drug trafficking area] representatives, there will be NO direct contact between K9 handlers, or line employees with ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics therein. All communication with ANY non-departmental and non-law enforcement entity or persons regarding the Nevada Highway Patrol K9 program or interdiction program WILL be expressly forwarded for approval to your choice-of-command. Communication will be accomplished by the appropriate manager/commander if deemed appropriate. Any violation of this edict will be considered insubordination and will be dealt with appropriately.

(Complaint #1 at ¶ 188.) As averred in the complaint, Plaintiffs' speech would have addressed the NHP's misuse of funds, encouragement of unconstitutional searches, and the "sabotage" of the K9 program, which are clearly matters of public concern. *See, e.g.*, *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) ("[T]he competency of the police force is surely a matter of great public concern."). The five televised interviews addressing these subjects provide additional support that these subjects are matters of public concern.

Furthermore, Tice's email regulates speech beyond that which "the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 422. The email restricts "ANY" contact with non-NHP personnel "for the purpose of discussing the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics therein." The focused "any" combined with the prohibition on "discussing . . . the K9 program" suggests that this restriction applies to speech

9

1   merely "related to" the K9 program. *See Clarke*, 574 F.3d at 383. In *Clarke*, the Milwaukee

2   sheriff's employment policy required employees to keep "official agency business" confidential. *Id*.

3   The court held that the composition of "official," "agency," and "business" indicated that the policy

4   only regulated speech "grounded in the public employee's professional duties." *Id*. The court

5   specifically contrasted the regulation of "official" speech–speech "authorized or approved by a

6   proper authority"–with speech "tangentially related to" the department's business. *Id*. The *Clarke*

7   court's implication, of course, is that a prior restraint on the latter category of speech exceeds the

8   government's authority. Tice's email falls squarely within the ambit of this implication. Therefore,

9   Tice's email restricted speech made "as a citizen" on matters of public concern, and *Pickering*

10  balancing is appropriate.

11          Since Defendants have asserted the defense of qualified immunity, however, not just any

12  *Pickering* balancing will do. In a suit against a government official for an alleged violation of a

13  constitutional right, the court must determine early on whether the official is entitled to qualified

14  immunity. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled on other grounds by Pearson*

15  *v. Callahan*, 555 U.S. 223 (2009). Qualified immunity is appropriate if the facts, taken in the light

16  most favorable to the plaintiff, show that the officer's conduct did not violate a clearly established

17  constitutional right. *Id*. at 201. And a right is "clearly established" when " a reasonable official

18  would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635,

19  640 (1987). Because *Pickering* balancing is a "context-intensive, case-by-case" inquiry, "the law

20  regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified

21  immunity." *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998). That is, in the qualified

22  immunity context, the question becomes whether "the outcome of the *Pickering* balance so clearly

23  favors [Plaintiffs] that it would have been patently unreasonable for [Defendants] to conclude that

24  the First Amendment did not protect [Plaintiffs'] speech. *Gilbrook*, 177 F.3d at 867 (citation and

25  quotation marks omitted).

26

On similar facts, the Ninth Circuit found it "clearly established" that "the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs a state employer's interest in avoiding a mere potential disturbance to the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009). In *Robinson*, the plaintiff Los Angeles police officer sued for retaliation after he was disciplined for failing to follow the proper channels of communication in making complaints about department corruption, discrimination and misconduct. *Id*. at 822. The court noted that "[e]ven in a police department, the complained-of disruption must be real and not imagined." *Id*. at 824 (citation and quotation marks omitted). The employer must show "actual injury to its *legitimate* interests." *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 427 (9th Cir. 1995). And the employer "does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Id*. Finally, the court denied qualified immunity based on an insufficient showing of "disruption" as well as the clearly established law that "[a]n employer's written policy requiring speech to occur through specified 'channels' [is] insufficient to justify retaliation motivated by protected speech." *Robinson*, 566 F.3d at 826 (citing *Anderson v. Central Point Sch. Dist.*, 746 F.2d 505, 506 (9th Cir. 1984)).

If such a policy is insufficient to justify punishment after speech, it is *a fortiori* insufficient to justify a prior restraint of that speech. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (applying a presumption against constitutionality to prior restraints). NHP has offered three justifications for the prior restraint embodied in Tice's "channels" email, none of which are sufficient. First, NHP argues that Tice's email represents NHP's attempt to "resolve inconsistencies" in advance of a legislative hearing on the K9 program. (NHP's Mot. To Dismiss #48, p. 25.) This rationale was addressed in *Johnson*: NHP does not have a *legitimate* interest in avoiding the disruption that necessarily accompanies whistleblowing. *See* 48 F.3d at 427. Indeed, the public's interest in NHP corruption is at its zenith before a public legislative hearing. *See*

*Gilbrook*, 177 F.3d at 867. Second, NHP claims that Tice's email simply enforced an NHP confidentiality policy applicable (with some exceptions not relevant here) to all "information that is not a matter of public record." (NHP's Mot. to Dismiss #48, p. 26.) As the *Robinson* court noted, however, an employee's violation of a written policy might strengthen the employer's position in the *Pickering* balance, but it is not alone dispositive.[3] 566 F.3d at 825 (quoting *Connick v. Myers*, 461 U.S. 138, 153 n. 14. (1983)). Finally, NHP contends that a government employer has the right to control its own speech. This is both true and irrelevant. NHP has advanced no argument suggesting that speech in violation of Tice's directive would have somehow coopted NHP's speaking platform. *See Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013-17 (9th Cir. 2000) (holding that a teacher could be prevented from posting anti-gay material on bulletin boards that school administrators used to communicate with the school's teachers and students).

The *Gilbrook* factors also weigh in favor of Plaintiffs' interest in their protected speech. First, Tice's email restricted only comments to entities outside of law enforcement. Thus, it explicitly prohibited statements directed at the press. In addition, Plaintiffs did not occupy high-level, policy-making positions "for which personal loyalty and confidentiality are indispensable." *Gilbrook*, 177 F.3d at 868. And NHP has presented no argument that Plaintiffs' statements would have affected their own duties, impaired close working relationships, or obstructed routine office operations. *Id*. The *Pickering* balance therefore weighs in favor of Plaintiffs, and it does so clearly. Accordingly, Tice is not entitled to qualified immunity.

On the other hand, Plaintiffs claims against NHP official Jackson and LVMPD official Zeil both fail. NHP official Jackson is entitled to qualified immunity. Jackson prohibited Moonin from associating with another trooper. As recounted in the complaint, Jackson told Moonin that he "was not to talk or associate with Bill West up in Reno." (Complaint #1 at ¶ 224.) Personal communication between two employees at the same level of authority does not typically become

---

[3] And, moreover, the court has doubts that such a broadly worded policy is itself constitutional.

1   speech on a matter of public concern. *See Whitney v. City of Milan*, 677 F.3d 292, 297 (6th Cir.

2   2012) ("[T]o the extent [defendant's] order interfered with [plaintiff's] personal communications

3   with [plaintiff's former co-employee], that speech is not a matter of public concern.") *See also*

4   *Desrochers v. City of San Bernardino*, 572 F.3d 703, 714 (9th Cir. 2009) (noting that the Ninth

5   Circuit has "recognized . . . that [a] limited audience weigh[s] against [a] claim of protected

6   speech" and collecting cases). Indeed, Moonin has provided no reason to believe that the point of

7   speaking to West would be "to bring to light actual or potential wrongdoing." *Connick*, 461 U.S. at

8   148.

9          However, even assuming Jackson's order prevented Moonin from speaking on a matter of

10  public concern, the *Pickering* balance does not "so clearly weigh in favor of [Moonin] that it was

11  patently unreasonable for [Jackson] to conclude that the First Amendment did not protect

12  [Moonin's] speech." *Gilbrook*, 177 F.3d at 870. For example, Moonin's contemplated speech

13  would be directed to a "governmental colleague" rather than "to the public or media." *Id*. at 868.

14  Furthermore, Moonin and West's associational interests implicate "routine office operations," "the

15  speaker[s'] performance of [their] duties," and "co-worker relations" in a way that Moonin's

16  prospective statements to outside entities do not. *Id*. And though Moonin asserts an interest in

17  speaking with West on "matters of public concern" like corruption in the K9 program, the

18  complaint suggests that West was already aware of these matters at the time of Jackson's order.

19  (Complaint #1 at ¶ 224 ("Trooper West contacted command staff regarding the K9 units [sic]

20  shared concern.").) Therefore, Moonin's communiques would not have resembled "good-faith

21  whistleblowing" sufficient to clearly outweigh the government employer's interest in managing its

22  internal affairs. *Robinson*, 566 F.3d at 824 (citation and quotation marks omitted). Therefore,

23  Jackson is entitled to qualified immunity.

24         In contrast to the claim against Jackson, Plaintiffs' claim against LVMPD official Zeil does

25  not even warrant *Pickering* balancing. Plaintiffs allege that, at a September 2011 meeting, Zeil

26  stated that "narcotics detailed is a covert mission" and forbade "all K9 officers from discussing 'our

13

business' with anyone outside the unit." (Complaint #1 at ¶ 250-51.) These comments lack the effectiveness of either Jackson or Tice's order, suggesting that they do not effect a prior restraint at all. Unlike Tice's order, Zeil's comments did not subject "the enjoyment of protected expression... [to] the approval of government officials," *Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998). Nor did Zeil's comments threaten punishment. They were issued orally, upon one occasion, in what Plaintiffs admit was a spirit of "warning." (Plaintiffs' Response #76, p. 11:12.) Warnings differ from commands in ways salient to the application of the First Amendment: while commands presume the speaker's authority over the hearer, warnings do not. And without real or presumed authority, Zeil could not have implemented an actual restraint on Moonin's expression.

Most importantly, even if Zeil's comments did enact a prior restraint, this restraint swept more narrowly than Tice's email in its prohibition of speech. Zeil prohibited the discussion of "our business" with outside entities, regulating "only speech grounded in the public employee's professional duties." *See Clarke*, 574 F.3d at 383 (quoting *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1052 (7th Cir. 2008)). Since this type of speech is not speech made as "[a] citizen[] for First Amendment purposes," *Garcetti*, 547 U.S. at 421, Zeil's prohibition is not subject to *Pickering* balancing. Plaintiffs claim against Zeil thus fails as a matter of law.

### 2. First Amendment Retaliation Claim

Plaintiffs' First Amendment retaliation claim also fails as a matter of law. The sketch of a First Amendment retaliation claim under 42 U.S.C. § 1983 includes protected speech, an adverse employment action, and causation between the two. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). In the Ninth Circuit, this sketch is fleshed out into five questions: (1) Did the plaintiff speak on a matter of public interest? (2) Did the plaintiff speak as a private citizen or as a public employee? (3) Was the plaintiff's protected speech a substantial or motivating factor in the adverse employment action? (4) Did the state have adequate justification for treating the employee differently from other members of the general public? (5) Would the state have taken the adverse

14

1   employment action even absent the protected speech? *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.

2   2009).

3          Plaintiffs' complaint falters on the first three prongs–prongs on which Plaintiffs bear the

4   burden. *Eng*, 552 F.3d at 1070-71. Plaintiffs allege that they (1) "reported widespread

5   unconstitutional searches, improper officer behavior . . . and the many negative impacts of

6   implementing lower training standards," (2) "discussed malfeasance" regarding the K9 program's

7   funding, and (3) "discussed the frustration, interference, and sabotage of the K9 Program."

8   (Complaint #1 at ¶ 387.) However, coming on the heels of almost eighty pages of factual recitation,

9   Plaintiffs' retaliation claim fails to identify the "form and context" of the speech at issue, *Connick*,

10  461 U.S. at 147, rendering it impossible to discern which speech gave rise to which acts of

11  retaliation. This failure not only deprives Defendants of the ability to suss out speech made as an

12  employee from speech made as a citizen, *Garcetti*, 547 U.S. at 421, but it also undermines any

13  causal connection between the speech and the alleged retaliatory acts. Therefore, Plaintiffs have

14  failed to state a prima facie case of First Amendment retaliation.

15      **D.  State Civil Conspiracy**

16         Plaintiffs have failed to plead a conspiracy with an unlawful objective. "An actionable civil

17  conspiracy consists of a combination of two or more persons who, by some concerted action, intend

18  to accomplish an unlawful objective for the purpose of harming another, and damage results from

19  the act or acts." *Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256

20  (Nev. 1998) (quotation marks and citation omitted). The alleged conspiracy's objective here was to

21  "force the constructive resignation of the Plaintiffs and/or destroy the K9 Program and Plaintiffs'

22  positions within the program." (Complaint #1 at ¶ 434.) However, while the mismanagement of the

23  K9 program is a wrong demanding political redress, it is not a wrong warranting legal redress. Nor

24  is Plaintiffs' "constructive termination" unlawful absent some reason to believe the termination

25  worked an independent tort. *See Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110

26  P.3d 30, 51 (Nev. 2005), *abrogated on other grounds by Buzz Stew, LLC v. City of North Las*

*Vegas*, 181 P.3d 670 (Nev. 2008). Since Plaintiffs have not provided such a reason, they have failed to state a claim for civil conspiracy under Nevada law.

### E.  Federal Conspiracy under 18 U.S.C. § 1985(1)

Section 1985(1) prevents a conspiracy to interfere with "any person... holding any office... under the United States." "The clear import of this language is that the statute's protections extend exclusively to the benefit of federal officers." *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir. 1981). Plaintiffs do not dispute that they are state, not federal, officers. Therefore, this cause of action fails.

### F.  Defamation

In Nevada, the plaintiff bears the burden of proving four elements in a defamation claim: "(1) a false and defamatory statement; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Clark County School District v. Virtual Education Software, Inc.,* 213 P.3d 496, 503 (Nev. 2009). However, the defendant bears the burden of proving that a publication is "privileged." *Pope v. Motel 6,* 114 P.3d 277, 284 (Nev. 2005). Privileged publications include intra-agency communications that occur "in the regular course of the [agency]'s business." *Id* . (quoting *Simpson v. Mars Inc.,* 929 P.2d 966, 968 (Nev. 1997)). However, the abuse of the intra-agency privilege effects its waiver. "A conditional privilege may be abused by publication in bad faith, with spite or ill will or some other wrongful motivation toward the plaintiff, and without belief in the statement's probable truth." *Circus Circus Hotels, Inc. v. Witherspoon,* 657 P.2d 101, 105 n. 2 (Nev. 1983) (citing *Gallues v. Harrah's Club,* 491 P.2d 1276, 1277 (1971)).

Here, Plaintiffs have alleged five separate defamatory statements. Defendants have asserted both truth and privilege as defenses. While privilege may be a successful defense at the motion to dismiss stage, the defense of truth requires the court to make judgments of credibility. The latter task is not native to this stage of the litigation. Therefore, Defendants will succeed on their motions to dismiss only to the extent their defense of privilege succeeds.

With respect to three of the alleged defamatory statements, Plaintiffs have successfully pleaded abuse of the intra-agency privilege. First, Plaintiffs allege that Perry defamed Yarnall by stating that Yarnall had been sued repeatedly for excessive force and other civil rights violations. (Complaint #1 at ¶ 484.) Perry made this statement to his superior prior to Yarnall's hire, and Perry's superior then initiated an investigation. Since Perry had potential supervisory authority over Yarnall, and since the circumstances of this statement indicate it was made for the legitimate department purpose of investigating a potential hire, this statement falls within the intra-agency privilege. However, Plaintiffs have also alleged that this statement was made "with either knowledge of [its] falsity or with reckless disregard of [its] truth." (*Id*. at ¶ 486.) While "bare assertions . . . amount[ing] to nothing more than a formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth," *Moss*, 572 F.3d at 969, Plaintiffs have pleaded sufficient animus on the part of Perry against the K9 program and its affiliates to raise a plausible claim that Perry abused the intra-agency privilege. Plaintiffs have therefore stated a claim of defamation against Perry.

Similarly, Plaintiffs allege that NHP official Lewis defamed Yarnall and Lee by claiming that they were planting drugs during traffic stops. While this statement is eligible for protection by the intra-agency privilege, Lewis's animus against the K9 program suggests that he may have abused this privilege, as Plaintiffs have alleged.

Third, NHP official Peterson allegedly defamed Moonin by stating that Moonin's dog "Teko" had no role in the seizure of drugs or money in one particular case. Defendants allege that dogs cannot be defamed, and therefore that the statement does not constitute defamation. "A statement is . . . defamatory if it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, and hold the subject up to contempt." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 88 (2002) (citation and quotation marks omitted). Here, Plaintiffs have alleged that Peterson's statement was reasonably understood to impugn Moonin's skill as a dog handler. Therefore, Plaintiffs have successfully stated a defamation claim

against Peterson. *See Keller v. City of Reno*, 587 F. Supp. 21, 23 n. 5 (D. Nev. 1984) ("The plaintiffs need not have been specifically named in the address if it is found that defendant['s] remarks could reasonably be understood as applying to them.").

The remaining defamation claims fail because the alleged defamatory statements are not, in fact, defamatory. Plaintiffs allege that Tice told a Department of Public Safety Information Officer that the K9 program resembled the infamous Los Angeles Police Department Rampart Division. This statement, interpreted in context, is one that a reasonable person would interpret as "mere rhetorical hyperbole," and therefore it is not actionable in defamation. *Pegasus*, 57 P.3d at 88. Plaintiffs insist this statement is defamatory because Tice did not preface his statement with "in my opinion," but this insistence ignores the context in which the comments were made. *Id*. As alleged in the complaint, the comparison between the Rampart Division and the K9 program focused on the program's decentralized command. (Complaint #1 at ¶ 138.) In the context of this focus, other potentially defamatory implications–that the K9 program was akin to a criminal organization–are clearly hyperbolic in the view of a reasonable interpreter. Therefore, Tice's statement is not defamatory.

Finally, Plaintiffs allege that Perry singled out Moonin as the source of the leaks to media outlets regarding NHP's illegal and corrupt activities. This statement is not defamatory since such an accusation would not "tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, [or] hold the subject up to contempt." Rather, "in the estimation of the community," this type of whistleblowing is laudable. Since "it is not one's reputation in a limited community in which attitudes and social values may depart substantially from those prevailing generally which an action for defamation is designed to protect," *see Saunders v. Bd. of Directors, WHYY-TV (Channel 12)*, 382 A.2d 257, 259 (Del. Super. 1978), Perry's identification of Moonin as a whistleblower was not defamatory.

**G.  Trespass**

To sustain a trespass action, Plaintiffs must show that a property right was invaded. *Lied v.*

*Clark County*, 579 P.2d 171, 173 (Nev. 1978). No property right was invaded if the invader was acting pursuant to a privileged right of entry. *See Winchell v. Schiff*, 193 P.3d 946, 952 (Nev. 2008). However, when a person exercises his privilege to enter land unreasonably, that person is liable for the harm caused by the unreasonable conduct. Restatement (Second) of Torts § 214 (1965).

Here, Plaintiffs allege that NHP official Zapata intentionally entered plaintiff Lee's land without authorization, causing damage in the process. After Lee resigned his assignment with the K9 program, the NHP demanded the return of Lee's dog's kennel, which Lee kept at his house. Lee had installed the dog kennel in his backyard with a crane, and Lee told the NHP that they would have to remove it with a crane. Instead, Zapata and other NHP officers destroyed Lee's backyard fence in order to remove the kennel. (Complaint #1 at ¶ 318.) Lee later filed a police report.

Plaintiffs have successfully alleged a trespass claim against Zapata. Zapata responds that his entry onto Lee's land was privileged because Lee wrongfully prolonged his possession of the NHP's kennel. Even if this is true, however, the destruction of Lee's property raises a question of fact as to whether Zapata's entry was "reasonable," Restatement (Second) of Torts, *supra*, §198, and whether it exceeded the scope of Zapata's privilege. Therefore, Plaintiffs' trespass claim survives the motion to dismiss.

## H.  Nevada Fraud

Plaintiffs allege that NHP official O'Rourke defrauded Yarnall by promising that his contract would be renewed when, in fact, O'Rourke knew that it would not be. Since O'Rourke is not a named defendant in this action, this claim fails.

## I.  Unjust Enrichment

"Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) (citation omitted). However, "[a]n action based on a theory of unjust enrichment is not

available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).

Here, Plaintiffs' unjust enrichment claim centers on the uncompensated time and effort Yarnall spent on the development of the K9 program. However, Plaintiffs have alleged that Yarnall had a valid written contract with NHP, and they are therefore barred from lodging an unjust enrichment claim under *Leasepartners*.

### J.   Nevada Anti-SLAPP and *Noerr-Pennington* Doctrine Defenses

NHP has raised Nevada's anti-SLAPP law and the *Noerr-Pennington* doctrine as defenses. Nevada's anti-strategic lawsuit against public participation ("anti-SLAPP") statute, NRS § 41.635 *et seq.*, provides that a defendant may bring a special motion to dismiss within sixty days after service of the complaint if the complaint is "brought against a person based upon good faith communications in furtherance of the right to petition." NRS § 41.660. "Communications in furtherance of the right to petition" include communications to an officer of a governmental entity that reasonably concern the governmental entity. *John v. Douglas County Sch. Dist.*, 219 P.3d 1276, 1286 (Nev. 2009). And "good faith communications" are communications that are truthful or made without knowledge of falsehood. *Id.*

In light of the court's decision above, NHP's argument that Nevada's anti-SLAPP statute bars Plaintiffs' state law claims applies only to the defamation claims.[4] The conditional privilege applicable to the defamation claims–intra-agency privilege–mimics the definition of "communications in furtherance of the right to petition," at least with respect to governmental entities. *See Pope,* 114 P.3d at 284 (defining intra-agency communications as communications that occur "in the regular course of the [agency]'s business"). However, this privilege only applies

---

[4] Most of Plaintiffs' state law claims have not survived the various motions to dismiss for failure to state a claim, and Plaintiffs' surviving trespass claim does not address speech.

where it has not been abused, and abuse is defined as "publication in bad faith . . . without belief in the statement's probable truth." *Circus Circus,* 657 P.2d at 105 n. 2 (citation and quotation marks omitted). That is, the intra-agency privilege is abused where the communications are not in "good faith" for the purposes of Nevada's anti-SLAPP statute.

Therefore, as relevant here, the anti-SLAPP statute and the intra-agency privilege apply to Plaintiffs' claims to the same extent. Since Plaintiffs have successfully alleged the abuse of the intra-agency privilege with respect to certain defamation claims, they have successfully questioned whether certain Defendants' statements were "good faith communications." Consequently, Nevada's anti-SLAPP does not bar the defamation claims to a greater extent than does the intra-agency privilege.

Finally, NHP argues that the *Noerr-Pennington* doctrine warrants dismissal of all Plaintiffs' claims. The *Noerr-Pennington* doctrine is the federal analogue to the anti-SLAPP statute, protecting "those who petition any department of the government for redress" from "statutory liability for their petitioning conduct." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008). Here, however, Defendants' potential liability is not premised on any protected petitioning activity. *See id.* at 1007 (discussing protected lobbying activity). Therefore, the *Noerr-Pennington* doctrine is inapplicable.

**K.  Leave to Amend**

Plaintiffs have requested leave to amend in the event their complaint is found wanting. It is, and they are granted leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to amend] when justice so requires." And "justice so requires" in most cases, since the Rules favor "an opportunity to test [ ] claim[s] on the merits." *Forman v. Davis*, 371 U.S. 178, 182 (1962). Therefore, Plaintiffs are entitled to amend their complaint.

**IV.  Conclusion**

Plaintiffs' First Amendment claim against Tice, three of their defamation claims, and their trespass claim have survived Defendants' motions to dismiss. The other claims have not.

21

IT IS THEREFORE ORDERED that Makor K-9 and Rispoli's Motion to Dismiss (#31) is GRANTED.

IT IS FURTHER ORDERED that LVMPD and Ziel's Motion to Dismiss (#32) is GRANTED.

IT IS FURTHER ORDERED that Gillespie, English, and Jaeger's Motion to Dismiss (#33) is GRANTED.

IT IS FURTHER ORDERED that NHP's Motion to Dismiss (#38) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs are granted leave to amend their complaint, provided that the amended complaint does not exceed thirty (30) pages and provided the amended complaint is filed within twenty (20) days of the date of this order's filing.

IT IS SO ORDERED.

DATED this 13th of April, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE