1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                      * * *

9    MATT MOONIN; DONN YARNALL; and      )
     ERIK LEE,                           )
10                                       )        3:12-CV-00353-LRH-VPC
                    Plaintiffs,          )
11                                       )
     v.                                  )        ORDER
12                                       )
     STATE OF NEVADA, *ex rel.*, its     )
13   DEPARTMENT OF PUBLIC SAFETY         )
     HIGHWAY PATROL; LAS VEGAS           )
14   METROPOLITAN POLICE DEPARTMENT;     )
     CITY OF LAS VEGAS; CLARK COUNTY;    )
15   DOUG GILLESPIE, Sheriff; DAVE LEWIS;)
     JOHN STEWART; KEVIN TICE; THOM      )
16   JACKSON; JIM PETERSON; WAYNE        )
     PROSSER; CHARLES HAYCOX; BRIAN      )
17   SANCHEZ; HUGH SHOOK; TODD           )
     ELLISON; ERVIN RAAB; BEN LEONARD;   )
18   LUIS ZAPATA; DONALD DICE; CHRIS     )
     PERRY; PAT GALLAGHER; GREG ZIEL;    )
19   DALE JAEGER; MEL ENGLISH; TOM       )
     HIGGINS, individually and in their official )
20   capacities; MARK RISPOLI; MAKOR K-9;)
     DOES 1-9, inclusive; and CORPORATIONS )
21   10-14,                              )
                                         )
22                  Defendants.          )
                                         )
23   _____ )

24        Before the Court is Defendants State of Nevada, *ex rel.*, its Department of Public Safety

25   Highway Patrol, Dave Lewis, Kevin Tice, Thom Jackson, Jim Peterson, Wayne Prosser, Charles

26   Haycox, Brian Sanchez, Hugh Shook, Ervin Raab, Ben Leonard, Luis Zapata, Donald Dice, Pat

Gallagher, Tom Higgins, and Chris Perry's (collectively "Defendants") Second Motion for Judgment on the Pleadings for Failure to State a Claim and Special Motion to Dismiss Pursuant to Nevada Revised Statute ("NRS") 41.635.  Doc. #118.[1]  Plaintiffs Matt Moonin, Donn Yarnall, and Erik Lee (collectively "Plaintiffs") filed a Response (Doc. #124), to which Defendants replied (Doc. #127).

**I.    Facts and Procedural History**

This dispute concerns the creation and implementation of a canine drug detection unit ("K9 program") within the Nevada Highway Patrol ("NHP").  Plaintiffs filed their original Complaint on June 26, 2012.  Doc. #1.  After extensive briefing on Defendants' various Motions to Dismiss, the Court entered an Order on April 15, 2013, dismissing ten of the 13 claims in Plaintiffs' original Complaint.  Doc. #100.  Thereafter, on May 3, 2013, Plaintiffs filed a First Amended Complaint ("FAC"), whereby they allege ten claims, three of which are new.  Doc. #101.  On June 7, 2013, the Court dismissed with prejudice Defendants Dale Jaeger, Las Vegas Metropolitan Police Department, Greg Zeil, Mel English, and Doug Gillespie.  Doc. #113.  Also on June 7, 2013, the Court dismissed with prejudice Mark Rispoli and Makor K-9.  Doc. #114.

In their FAC, Plaintiffs allege the following set of facts.[2]  Plaintiffs are officers who were formerly involved in the K9 program.  Plaintiffs Lee and Moonin are former NHP K9 troopers, and Plaintiff Yarnall is the former architect of the NHP's K9 program.  Defendants are, for the most part, various NHP officials led by Defendant Perry.  Plaintiffs allege that NHP higher-ups were against the K9 program from the start.  When the K9 program finally got off the ground, these higher-ups worked to undermine and marginalize it.  NHP officials expressed antipathy toward the K9 program in a variety of ways: by shuffling the K9 program from one umbrella department to

---

[1]  Refers to the Court's docket number.

[2]  In reviewing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the Court accepts all facts alleged in the Complaint as true.  *McGlinchy v. Shell Chemical Co.*, 854 F.2d 802, 810 (9th Cir. 1988).

1   another in an attempt to destabilize it; by requiring time-consuming and redundant training of the

2   K9 troopers; by springing last-minute busywork on Yarnall; by tampering with Yarnall's written

3   reports to make it seem as if Yarnall were incompetent; by deleting training records from

4   computers; by delaying contractual payments to Yarnall and reimbursements to Lee; by accusing

5   Yarnall of a history of excessive force complaints; by initiating baseless internal investigations; and

6   by refusing to investigate Plaintiffs' complaints.

7        As a consequence of NHP's efforts to undermine the K9 program, officers began engaging

8   in routine Fourth Amendment violations.  After Plaintiffs objected to this intentional

9   mismanagement, NHP officials retaliated against them.  Despite all this, the K9 program initially

10  flourished, yielding impressive drug and currency seizures. The K9 program's success was due in

11  large part to the high training standards Yarnall had implemented—standards he had erected by

12  working longer hours and more days than his contract required.  And so, the NHP officials sought

13  to replace Yarnall's high standards with lower ones.  As part of this effort, NHP officials allegedly

14  filed false complaints against Yarnall and Lee; took files from the K9 program's offices; denied the

15  provision of necessities like dog food; and issued orders barring dogs from the K9 program's

16  offices.  They also claimed a lack of resources, despite the fact that the K9 program was funded out

17  of seized currency and despite the fact that the K9 program had seized more than enough money to

18  keep the program going.

19        In 2009, Lee and Moonin began observing the toll these efforts were having.  Attempts to

20  decentralize the program and reduce training standards had led to increased Fourth Amendment

21  violations by K9 troopers.  Lee and Moonin alerted NHP officials to this, but their warnings went

22  unheeded.  When, in late 2009, the NHP officials replaced the K9 program's head with someone

23  more pliable, the K9 troopers submitted a letter to the Director of the Department of Public Safety

24  outlining their grievances.  As a result of the letter, NHP officials eliminated the K9 troopers'

25  ability to earn overtime, they malingered with respect to renewing Yarnall's contract, and they gave

26  Moonin unnecessary tasks.

At the end of 2010, the K9 program's last high-ranking defender, the Director of the Department of Public Safety, retired.  Perry succeeded him as Director and intensified his campaign to ghettoize the K9 program.  For example, while Yarnall's contract extension had been assured under the prior Director, Perry decided not to renew Yarnall's contract.  In April 2011, Perry split the K9 program into two squads including both NHP officers and LVMPD officers.  During the following summer, Moonin observed a marked increase in unconstitutional searches.  In particular, Moonin was alarmed at the routine practice of poking holes in packages at a FedEx sort facility so that K9 program dogs could more easily smell the packages' contents.  Moonin reported this practice, but his reports did not result in any changes.

While the dogs' nose for drugs failed, the media's nose for news did not.  At least five televised interviews with members of NHP and LVMPD occurred over the course of late 2011 and early 2012, centering on the unconstitutional searches and the implosion of the K9 program.  Rumors spread that Moonin was the media's source.  Moonin denied these rumors, but they caused him significant grief.  NHP and LVMPD employees ramped up their harassment, and Moonin eventually filed a complaint with NHP's Office of Professional Responsibility.  Moonin also requested a transfer out of his squad, but his request was ignored.

In September 2011, the NHP's K9 troopers—including Moonin and Lee—resigned en masse from the K9 program.  They cited their objections to the training methods as well as the resulting civil rights violations.  NHP placed Moonin and Lee in lower-status positions within the NHP, where they remain.

## II.     Legal Standard

When an answer is filed before a motion to dismiss is filed, the latter then becomes a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  *Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980).  Nevertheless, the standard by which a court evaluates a motion for judgment on the pleadings for failure to state a claim is the same as that by which a court evaluates a motion to dismiss for failure to state a claim.  *McGlinchy v. Shell Chem.*

4

1   *Co.*, 845 F.2d 802, 810 (9th Cir. 1988).

2       To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the

3   Federal Rule of Civil Procedure 8(a)(2) notice pleading standard.  *See Mendiondo v. Centinela*

4   *Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008).  A complaint must contain "a short and

5   plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

6   The Rule 8(a)(2) pleading standard does not require detailed factual allegations; however, a

7   pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

8   cause of action" will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

9   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

10      Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter,

11  accepted as true, to state a claim to relief that is plausible on its face."  *Id.* (internal quotation marks

12  omitted).  A claim has facial plausibility when the pleaded factual content allows the court to draw

13  the reasonable inference, based on the court's judicial experience and common sense, that the

14  defendant is liable for the misconduct alleged.  *See id.* at 678-79.  "The plausibility standard is not

15  akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has

16  acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's

17  liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at

18  678 (internal quotation marks and citation omitted).

19      In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as

20  true.  *Id.* (citation omitted).  However, "bare assertions . . . amount[ing] to nothing more than a

21  formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth."

22  *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at

23  680) (alteration in original) (internal quotation marks omitted).  The court discounts these

24  allegations because they do "nothing more than state a legal conclusion—even if that conclusion is

25  cast in the form of a factual allegation."  *Id.*  "In sum, for a complaint to survive a motion to

26  dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be

1  plausibly suggestive of a claim entitling the plaintiff to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

2  **III.     Discussion**

3      In their FAC, Plaintiffs lodge ten claims against Defendants, three of which are new.

4  Again, their claims fall into two broad categories: claims for Plaintiffs' personal harms (First

5  Amendment violations, First Amendment retaliation, state civil conspiracy, hostile work

6  environment, trespass, and unjust enrichment) and claims resulting from the mismanagement of the

7  K9 program (injunctive relief, failure to train under 42 U.S.C. § 1983, and oppression under color

8  of state law).  As the Court previously explained in its April 15, 2013 Order, Plaintiffs do not have

9  standing to assert the latter claims and thus cannot recover for the alleged mismanagement of the

10  K9 program.  *See* Doc. #100, pp. 5-6.

11      **A.     11th Amendment Immunity**

12      Again, the State of Nevada has asserted Eleventh Amendment immunity.  Generally, a state

13  may not be sued in federal court unless it consents to be sued.  U.S. Const. Amend. XI.  This

14  immunity applies to state agencies as well as state officials sued in their official capacity.

15  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).  As the Court previously

16  articulated in its April 15, 2013 Order, the State of Nevada and its agency, the NHP, are immune

17  from suit.  *See* Nev. Rev. Stat. ("NRS") § 41.031 (providing that Nevada has not waived its

18  Eleventh Amendment immunity); *see also* Doc. #100, p. 6.  Additionally, to the extent that the

19  individual Defendants are sued in their official capacity, they are also immune from suit.  Plaintiffs'

20  nonsensical argument to the contrary is entirely unavailing.

21      Furthermore, neither a state nor its officials acting in their official capacities are "persons"

22  under 42 U.S.C. § 1983, and therefore section 1983 does not provide a cause of action against these

23  entities.  *Will v. Michigan State Police*, 491 U.S. 58, 71 (1989).  This proposition is subject to one

24  exception: where the state official is sued for prospective injunctive relief, the action is properly

25  brought under section 1983.  *Wolfe v. Strankman*, 392 F.3d 358, 365 (9th Cir. 2004).   Here, only

26  Perry is subject to suit in his official capacity because the complaint seeks injunctive relief in the

6

form of reinstatement.  *See Wolfe*, 392 F.3d at 365.

**B.    Claims Stemming from Mismanagement of the K9 Program**

Plaintiffs' claims for injunctive relief, failure to train under section 1983, and oppression under color of state law all stem from the alleged mismanagement of the K9 program.  However, as the Court thoroughly explained in its April 15, 2013 Order, Plaintiffs do not have standing to assert these claims.

**1.    Fourth Claim for Injunctive Relief**

As to Plaintiffs' fourth cause of action for injunctive relief, the Court is unable to ascertain a legally cognizable theory on which the claim is based.  The fourth claim in the FAC itself is couched in terms of Fourth Amendment violations.  However, as the Court previously explained in its April 15, 2013 Order, Plaintiffs do not have standing to vindicate the Fourth Amendment rights of others.  Rather, in order to challenge Fourth Amendment violations, the challenger must show that the government has infringed his reasonable expectation of privacy.  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009).  This means that the Fourth Amendment violation must have been "a violation as to him, personally."  *Id*. (quoting *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)).  In an apparent attempt to clarify, Plaintiffs assert in their Opposition that "[D]efendants by way of their actions condoned fourth amendment violations, thereby placing each of the Plaintiffs, and other potential officers in a position of forced violation of the fourth amendment protections provided to citizens."  Doc. #124, p. 28.  Plaintiffs go on to state that "Defendants also fostered an environment by which its employees would be in violation of NRS 197.200[.]" Doc. #124, p. 28.  Again, these "clarifications" fall short of asserting an actionable interest in the subject of the searches and therefore fall short of alleging a redressable Fourth Amendment violation.  Accordingly, Plaintiffs' fourth claim for injunctive relief must fail.

**2.    Seventh Claim for Failure to Train in Violation of 42 U.S.C. § 1983**

In order to state a claim for failure to train in violation of 42 U.S.C. § 1983, Plaintiffs must sufficiently allege, among other things, that "they were deprived of their constitutional rights by

defendants and their employees acting under the color of state law." *Lee v. City of L.A.*, 250 F.3d 668, 681 (9th Cir. 2001).  Here again, Plaintiffs fail to allege a federally protected right of which they have been deprived.  Plaintiffs do not assert an actionable interest in the subject of the allegedly unconstitutional searches and therefore fall short of alleging a redressable Fourth Amendment violation.  Moreover, an apparent claim that they had some "federally protected right[]" to maintain the K9 training program established under Plaintiff Yarnall is entirely lacking in legal authority.  Accordingly, Plaintiffs seventh claim for failure to train must fail.

### 3.     Tenth Claim for Oppression Under Color of Office

Here, Plaintiffs allege a cause of action for oppression under color of office pursuant to criminal statute NRS 197.200.  However, as Defendants correctly aver, Plaintiffs have no standing to charge Defendants with violating NRS 197.000.  Plaintiffs argument that "[j]ustice demands that Defendants [sic] be prohibited from having this matter dismissed on a technicality" is woefully misguided.  Standing is not a mere "technicality."  Rather, "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Because Plaintiffs lack standing to enforce or bring a cause of action under NRS 197.200, their tenth claim for oppression under color of office must fail.

### C.     First Amendment Claims

Again, Plaintiffs have asserted two different breeds of First Amendment claims: prior restraint claims and a retaliation claim.

### 1.     Prior Restraint Claims

Plaintiffs' first claim against Defendant Tice in the FAC is materially unchanged from the same in the original Complaint.  *Compare* Doc. #1, pp. 78-80, *with* Doc. #101, pp. 11-12.  Moreover, Defendants have not advanced any new argument in support of their contention that the email at issue does not amount to a prior restraint or that Tice is entitled to qualified immunity.  *Compare* Doc. #38, pp. 25-29, *with* Doc. #118, pp. 14-19 (arguing that Tice's email simply reiterated and enforced an NHP confidentiality policy applicable to all information that is not a

matter of public information because such discussion has the potential to compromise sensitive criminal investigations, operations, and officer and public safety; that a government employer has a right to control its own speech; and that Tice's email was designed to prevent inconsistencies that had occurred since the K9 program's inception).  Accordingly, for all of the reasons articulated in the Court's April 15, 2013 Order denying Defendants' Motions to Dismiss Plaintiffs' first claim, the Court again finds that Plaintiffs have alleged a viable claim against Tice for violating the First Amendment, and further that Tice is not entitled to qualified immunity.  *See* Doc. #100, pp. 8-12.

Similarly, for the same reasons articulated in the Court's April 15, 2013 Order dismissing Plaintiffs' second claim, the Court again finds that Jackson is entitled to qualified immunity.  Plaintiffs have failed to remedy the deficiencies previously identified by the Court.  Plaintiffs added a new allegation that "West had personal knowledge of escalating public interest concerns regarding the current and ongoing degradation of ethics and standards within the Ice/K9 Program, as well as egregious civil rights violations.  Defendant Jackson was aware of West's knowledge regarding these incidents."  Doc. #101, ¶78.  Plaintiffs also added that Jackson's order "effectively prevented public exposure of corruption and mismanagement within the department."  Doc. #101, ¶81.  However, these new allegations still fall short of suggesting that the point of speaking to West would have been to disclose matters of public concern.  Plaintiffs confirmed in the FAC that West was already aware of these matters at the time of Jackson's order.  As such, Moonin's communiques would not have resembled "good-faith whisteblowing" sufficient to clearly outweigh the government employer's interest in managing its internal affairs.  *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (citation and quotation marks omitted).  Therefore, Jackson is still entitled to qualified immunity and Plaintiffs' second claim must fail.

### 2.    First Amendment Retaliation Claim

Plaintiffs' third claim for First Amendment retaliation claim also fails as a matter of law on the same grounds the Court articulated in its April 15, 2013 Order.  Plaintiffs failed to offer supplemental allegations that identify the "form and context" of the speech at issue.  *See* Doc.

#100, p. 15 (explaining that Plaintiffs' failure to identify the "form and context" of the speech at issue was fatal to their retaliation claim).  Accordingly, Plaintiffs have failed again to state a prima facie case of First Amendment retaliation and their third claim must fail.

**D.      State Civil Conspiracy**

Plaintiffs' fifth claim against Defendants in the FAC is materially unchanged from the same in the original Complaint. *Compare* Doc. #1, pp. 88-91, *with* Doc. #101, pp. 23-26.  For the same reasons articulated in the Court's April 15, 2013 Order, the Court again finds that Plaintiffs have failed to state a claim for civil conspiracy under Nevada law.  *See* Doc. #100, pp. 15-16. Accordingly, their fifth claim must fail.

**E.      Hostile Work Environment**

Plaintiffs' hostile work environment claim is largely repetitious of their previous slander/defamation claim, with added allegations that Defendants' allegedly false statements caused a hostile work environment. *Compare* Doc. #1, pp. 97-99, *with* Doc. #101, p. 23-26.  However, in their Response, Plaintiffs clarify that their hostile work environment claim is based on their protected status as whistleblowers under Title VII; the Federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h); and the Nevada False Claims Act, Nev. Rev. Stat. 357.250, *amended by* NV LEGIS 245 (2013).  *See* Doc. #124, pp. 45-46.

"Although not explicitly included in the text of Title VII, claims based on a hostile work environment fall within Title VII's protections."  *Panelli v. First Am. Title Ins. Co.*, 704 F. Supp. 2d 1016, 1028-29 (D. Nev. 2010) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).  However, "[a]n individual wishing to challenge an employment practice under [Title VII] must first file a charge with the [Equal Employment Opportunity Commission (EEOC)]."  *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 623 (2007) (superceded by statute on other grounds) (citing 42 U.S.C. § 2000e-5(e)(1)).  Here, Plaintiffs do not allege that they satisfied the requirements of 42 U.S.C. § 2000e-5(e)(1) by filing a charge with the EEOC or the Nevada Equal Rights Commission. Accordingly, their hostile work environment may not proceed under Title VII.

As to the FCA and the Nevada False Claims Acts, Plaintiffs evidently misunderstand the purpose of the whistleblower protections in those statutes.  "Section 3730(h) only protects employees who have acted 'in furtherance of an action' under the FCA."  *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1999).  Similarly, Section 357.240 only protects employees who have acted "in furtherance of an action brought pursuant to this chapter[.]"  Nev. Rev. Stat. 357.250.  Here, the entirety of Plaintiffs' allegations concern allegedly false statements made by various individual Defendants.  Plaintiffs do not allege that they engaged in any activity in furtherance of an FCA or Nevada False Claims Act investigation or proceeding.  *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) ("plaintiff alleging a FCA retaliation claim must show . . . that he or she engaged in activity protected under the statute").  Accordingly, Plaintiffs fail to state a claim for hostile work environment under the FCA or the Nevada False Claims Act.

**F.    Trespass**

Plaintiffs' eighth claim against Zapata in the FAC is materially unchanged from the same in the original complaint.  *Compare* Doc. #1, pp. 100-01, *with* Doc. #101, p. 27.  For the same reasons articulated in the Court's April 15, 2013 Order, the Court again finds that Plaintiffs' trespass claim against Zapata survives.  *See* Doc. #100, pp. 18-19.

**G.    Unjust Enrichment**

Here, Plaintiffs' claim for unjust enrichment against NHP may not proceed because NHP is entitled to Eleventh Amendment immunity.

**H.    Nevada Anti-SLAPP and *Noerr-Pennington* Doctrine Defenses**

Defendants raise Nevada's anti-SLAPP law and the *Noerr-Pennington* doctrine as defenses. As the Court previously determined, Nevada's anti-SLAPP statute only applies to Plaintiffs' speech-related claims.[3]  Doc. #100, p. 20.  However, Plaintiffs did not plead a cause of action for

---

[3] Specifically, the Court found that Nevada's anti-SLAPP statute only applied to Plaintiffs' surviving defamation claims.  Doc. #100, p. 20.

11

1  defamation in their FAC.  Accordingly, the Court finds that Nevada's anti-SLAPP law is

2  inapplicable.

3          Similarly, Defendants argue that the *Noerr-Pennington* doctrine warrants dismissal of all

4  Plaintiffs' claims.  The *Noerr-Pennington* doctrine is the federal analogue to the anti-SLAPP statute,

5  protecting "those who petition any department of the government for redress" from "statutory

6  liability for their petitioning conduct."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d

7  991, 1006 (9th Cir. 2008).  As the Court previously articulated, Defendants' potential liability is not

8  premised on any protected petitioning activity.  *See id*. at 1007 (discussing protected lobbying

9  activity).  Therefore, the *Noerr-Pennington* doctrine is inapplicable.

10         **I.     Leave to Amend**

11         Plaintiffs requested leave to amend in the event their FAC is found wanting.  The Court

12  shall treat this as a motion to amend.  "Although Federal Rule of Civil Procedure 15(a) provides that

13  leave to amend shall be freely given when justice so requires, it is not to be granted automatically."

14  *In re W. States Wholesale Natural Gas Antitrust Litig. v. Oneok, Inc.*, 715 F.3d 716, 738 (9th Cir.

15  2013) (quoting *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990)) (internal quotation

16  marks omitted).  Under Rule 15(a), the Court weighs five factors in determining whether justice

17  requires that leave to amend be granted: "(1) bad faith, (2) undue delay, (3) prejudice to the

18  opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended his

19  complaint."  *Id.* (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990)) (internal

20  quotation marks omitted).

21         Here, Plaintiffs had the opportunity to cure the deficiencies as set forth by the Court in its

22  April 15, 2013 Order, but failed to do so.  Instead, and to a significant extent, Plaintiffs repeated

23  claims and allegations that the Court previously determined were inadequate.  Additionally,

24  Plaintiffs did not re-plead the three defamation claims that survived Defendants' first Motion to

25  Dismiss.  Accordingly, the Court finds that Plaintiffs have unduly delayed amendment by failing to

26  diligently cure the deficiencies which the Court previously identified.

1    To the extent Plaintiffs assert new claims, the Court finds that amendment would be futile.

2 Moreover, Plaintiffs have not shown that they would be able to cure the FAC of any of its deficits.

3 Nor did they submit a proposed Second Amended Complaint to accompany their request.  *See* Local

4 Rule 15-1 (requiring that the moving party attach the proposed amended pleading to any motion to

5 amend).  For the aforementioned reasons, the Court denies Plaintiffs' request for leave to amend.

6 **IV.    Conclusion**

7    Plaintiffs' first claim for violation of the First Amendment against Tice and their eighth

8 claim for trespass claim against Zapata have survived Defendants' Motions to Dismiss.  Plaintiffs'

9 remaining claims shall be dismissed with prejudice.

10    IT IS THEREFORE ORDERED that Defendants' Second Motion for Judgment on the

11 Pleadings for Failure to State a Claim and Special Motion to Dismiss Pursuant to NRS 41.635 (Doc.

12 #118) shall be GRANTED in part and DENIED in part, in accordance with this Order.

13    IT IS FURTHER ORDERED that Defendants' Motion to File Pleading in Excess of Thirty

14 Pages (Doc. #116) is GRANTED.

15    IT IS FURTHER ORDERED that Plaintiffs' Motion to File Pleading in Excess of Thirty

16 Pages (Doc. #123) is GRANTED.

17    IT IS FURTHER ORDERED that Defendants' Motion to File Reply in Excess of Twenty

18 Pages (Doc. #128) is GRANTED.

19    IT IS SO ORDERED.

20    DATED this 16th of January, 2014.

21

22                                                    _____

LARRY R. HICKS

UNITED STATES DISTRICT JUDGE

23

24

25

26

13